UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA ANN WILLIAMSON,<br><br>   Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>   Defendant. | Case No.: 1:15-cv-01454 - JLT<br><br>ORDER AFFIRMING THE ADMINISTRATIVE DECISION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF PATRICIA ANN WILLIAMSON |

   Patricia Ann Williamson asserts she is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ applied the proper legal standards, as discussed below, the administrative decision is **AFFIRMED,** and the Commissioner's motion for summary judgment is **GRANTED**.

## PROCEDURAL HISTORY

   Plaintiff filed her application for benefits on December 13, 2011, alleging disability beginning on December 1, 2010. (Doc. 10-3 at 15) The Social Security Administration denied Plaintiff's

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as the defendant.

1

applications at both the initial level and upon reconsideration. (*See generally* Doc. 10-4) After requesting a hearing, Plaintiff testified before an ALJ on January 21, 2014. (Doc. 7-3 at 15, 34) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on March 6, 2014. (*Id.* at 15-25) When the Appeals Council denied Plaintiff's request for review of the decision on July 21, 2015 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

Plaintiff was in a car accident on January 18, 2010 and was transported to an emergency room, where x-rays showed "mild lumbar scoliosis" and "flattening" of her thoracic and lumbar curves.  (Doc. 10-9 at 11, 21)  She had a follow up appointment with the treating physician, Dr. Ajit Khaira, the next day, and Dr. Khaira noted Plaintiff received prescription pain medication.  (Doc. 10-8 at 17)

Although Plaintiff returned to Dr. Khaira for treatment a few times in 2010, she did not report having any back pain.  (Doc. 10-8 at 13-15)  Rather, her complaints included a cough, sinus problems, chest pain, headaches, and nose bleeds.  (*Id.*)

Plaintiff did not again report having pain in her back until July 2011.  (*See* Doc. 10-8 at 10-17)  When Plaintiff returned to Dr. Khaira a week later, she did not report having any pain.  (*Id.* at 9)  Plaintiff said she had watery eyes, and said she "walk[ed] everyday and need[ed] help losing weight."  (*Id.*)  Dr. Khaira did not indicate that Plaintiff reported having back pain for the remainder of 2011.  (*See id.* at 4-8)

Dr. Roger Wagner performed a comprehensive internal medicine evaluation on March 30, 2012.  (Doc. 10-8 at 20)  Plaintiff described having "low back pain with occasional radiation to the right

buttock," which occurred "off and on" and was exacerbated by "[b]ending, lifting, or long-term stooping." (*Id.*) She told Dr. Wagner she could "perform her own activities of daily living without assistance," including cooking, cleaning, driving, and shopping. (*Id.*) Dr. Wagner observed:

> [Plaintiff] was easily able to get up and out of the chair in the waiting room, walk at a normal pace back to the exam room without assistance, and sat completely comfortably throughout the entire history taking. The claimant was easily able to get on and off the exam table, very easily able to bed over at the waist and take shoes off and put them on without difficulty. She demonstrates good manual dexterity while doing so.

(*Id.* at 21) Dr. Wagner noted Plaintiff "was easily able to toe walk and heel walk," though she "complain[ed] of some low back pain when walking on toes." (*Id.* at 22) Dr. Wagner found Plaintiff had a negative straight leg raising test in the seating position, and positive in the "supine [position] at 90 degrees on the right and left, with [Plaintiff] having low back pain without radiation." (*Id.* at 23) He determined Plaintiff had "no real lumbar paravertebral muscle spasms or tenderness," and her strength was "5/5" in each extremity. (*Id.*) In addition, Plaintiff's touch and pinprick senses were intact. (*Id.*) Dr. Wagner noted that upon reviewing the medical clinic notes, Plaintiff had "waxing and waning complaints of migrating myalgias," but it was "[u]nclear if there was "anything in her back other than muscle strain." (*Id.*) He concluded Plaintiff did not have any limitations with sitting, standing, or walking. (*Id.*) Further, he opined Plaintiff was able to lift and carry "50 pounds occasionally [and] 25 pounds frequently," and "should stoop no more than frequently." (*Id.*) Dr. Wagner believed Plaintiff did not have any manipulative or environmental limitations. (*Id.* at 23-24)

Dr. Michael Cohn conducted a comprehensive psychiatric evaluation on April 2, 2012. (Doc. 10-8 at 27) Plaintiff told Dr. Cohn that she was seeking benefits for "severe back problems and other physical problems but no psychiatric issues. (*Id.*) Plaintiff said she had "not experienced any psychiatric problems whatsoever," and denied receiving psychiatric or psychological treatment of any kind. (*Id.*) She reported she was "able to take care of dressing, bathing and personal hygiene without difficult," drive a vehicle, pay bills, and run errands alone. (*Id.* at 28) Plaintiff told Dr. Cohn "[s]he stopped working because of budget cuts and was essentially laid off." (*Id.*) She said each day she "uses her computer to look for jobs, cleans her apartment to the extent that she is able given her physical limitations, cares for her grandchild," prepares meals, and watches television. (*Id.*) Dr. Cohn opined that Plaintiff's stream of mental activity, concentration, and judgment were within normal

limits. (*Id.* at 29-30) He concluded Plaintiff's ability to understand, remember, and carry out either simple or complex job instructions was "unimpaired." (*Id.* at 30) Dr. Cohn determined also that Plaintiff had "unimpaired" ability to maintain attention, concentration, persistence and pace; to accept instructions; maintain regular attendance; and interact with co-workers and the public. (*Id.* at 30-31) Dr. Cohn observed that Plaintiff's only "psychosocial stressor[]during the past year" was a hand injury, and gave Plaintiff a GAF score of 75.[2] (*Id.* at 30)

On April 6, 2012, Plaintiff went to the emergency room for shortness of breath, chest pain, and dizziness. (Doc. 10-8 at 40, 48) She reported she "ha[d] not felt well for almost 2-3 weeks." (*Id.* at 40) Upon examination, Plaintiff did not have any tenderness, and had normal strength and range of motion. (*Id.* at 49) However, Plaintiff's blood sugar level was 397, and she was "admitted with new onset diabetes mellitus." (*Id.*) She received counseling regarding diabetes, and said she wanted to take an "oral hypoglycemic, other than insulin." (*Id.* at 41)

Plaintiff had a follow-up appointment with Dr Khaira the following day, at which time they established her diabetes treatment. (Doc. 10-8 at 87) A week later, for a second follow-up regarding her sugar levels, Plaintiff reported she had "loss of sleep [and] rapid heart rate at night," and Dr. Khaira adjusted the medication. (*Id.* at 86) In May 2012, Plaintiff told Dr. Khaira that a medication was "making her feel sick," and that everything she ate caused her to feel nauseous, and Dr. Khaira adjusted her medications. (*Id.* at 80-84)

Dr. Ian Ocrant reviewed the record in May 2012, and noted Plaintiff had been diagnosed with diabetes, and had complained of back pain, headaches, nose bleeds, dizziness, bodyaches, fever, headaches, and pain in her hands. (Doc. 10-4 at 7) He concluded Plaintiff's physical impairments were "non-severe." (*Id.* at 7-8)

In August 2012, Plaintiff returned to Dr. Khaira and reported that her sugar levels had been low and she was "cutting down on" her medication. (Doc. 10-8 at 80) In addition, Plaintiff told Dr. Khaira that she had low back pain. (*Id.*) Dr. Khaira indicated that the results of Plaintiff's musculoskeletal/

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). With a GAF score between 71-80, "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning..." *DSM-IV* at 34.

extremities and back examinations were within normal limits. (*Id.*) Plaintiff continued to report having low back pain in October 2012. (*Id.* at 78) Again, Dr. Khaira indicated that an examination of Plaintiff's back was normal. (*Id.*)

In late September 2012, Plaintiff reported that she had chest pain for a week. (*See* Doc. 10-9 at 3, 23-24) Dr. Ronald Thant reviewed x-rays of Plaintiff's ribs and chest on October 4, 2012, and found her chest was "[n]ormal," and there was no evidence of a rib fracture. (*Id.*)

Dr. Robert Scott reviewed the medical record in December 2012, and concluded that Plaintiff did not have a medically determinable mental impairment. (Doc. 10-4 at 53, 54)

In January 2013, Plaintiff reported she did not have an MRI done, because medicine prescribed by Dr. Khaira in November did not help her relax. (Doc. 10-11 at 21, 25) In addition, Plaintiff reported that she fell "asleep all the time" and was "always sleepy." (*Id.*) Dr. Khaira observed that Plaintiff "ambulate[d] to the examination room without assistance" and was "able to sit comfortably on the examination without difficulty or evidence of pain." (*Id.* at 22) Dr. Khaira noted it was possible Plaintiff was "getting hypoglycemic as her sugar… [was] low even after she ha[d] eaten." (*Id.*)

Plaintiff told Dr. Khaira in March 2013 that she felt dizzy after eating to take medication. (Doc. 10-11 at 19) Dr. Khaira noted Plaintiff's sugar level was at 31, and she was given extra sugar, after which she felt better. (*Id.*) Upon examination, Dr. Khaira found "no evidence of bony tenderness, joint effusion, enlargement…, muscle fasciculations, atrophy, muscle weakness, asymmetry or reduced range of motion." (*Id.* at 20) According to Dr. Khaira, Plaintiff had normal strength of muscles and normal reflexes. (*Id.*)

On May 7, 2013, Plaintiff had an MRI of her lumbar spine. (Doc. 10-11 at 32) Dr. Bruce Ginier determined Plaintiff had a "left posterolateral disc bulge or protrusion …effacing the left lateral recess and likely compromising the left S1 nerve root" at the L5-S1 level. (*Id.* at 33) Dr. Ginier also determined that Plaintiff had "[m]ild to moderate central canal narrowing at L4-L5" and "[m]ild central canal narrowing at L3-L4," which were "secondary to posterior disc bulge in conjunction with facet and ligamentum flavum hypertrophy." (*Id.*) At a follow-up examination after the MRI, Dr. Khaira observed that Plaintiff had back pain "with flexion beyond 60 degrees." (*Id.* at 13)

In June 2013, Dr. Khaira noted that Plaintiff had back pain "with flexion beyond 45 degrees."

(Doc. 10-11 at 10) Plaintiff continued to demonstrate low back pain and joint pain upon examination in September 2013. (*Id.* at 4-5)

Dr. Ajit Khaira completed a "Physical Medical Source Statement" on January 16, 2014. (Doc. 10-11 at 36-38) Dr. Khaira noted that Plaintiff had been diagnosed with diabetes, hypertension, and back ache. (*Id.* at 36) Dr. Khaira indicated Plaintiff's symptoms included "back / leg / neck pain [and] headaches." (*Id.*) According to Dr. Khaira, Plaintiff could walk less than one block without needing to rest, sit for 10 minutes at one time, and stand for 15 minutes at one time. (*Id.*) Dr. Khaira opined that Plaintiff was able to stand and walk for less than 2 hours in an 8-hour day, and needed to be able to shift positions, walking every 10-15 minutes. (*Id.* at 36-37) Dr. Khaira believed Plaintiff could lift and carry less than 10 pounds frequently and 10 pounds occasionally. (*Id.* at 37) In addition, Dr. Khaira indicated that Plaintiff could rarely twist or stop, occasionally climb ladders, and frequently climb stairs. (*Id.*) Dr. Khaira concluded Plaintiff's symptoms were "likely… severe enough to interfere with attention and concentration needed to perform even simple work tasks," and she was incapable of tolerating even 'low stress work.'" (*Id.* at 38, emphasis omitted) Dr. Khaira did not complete the section of the form requesting a reason for these conclusions. (*See id.*)

**B.   Lay Witness Statements**

1.   Rodney Newsom

Plaintiff's husband, Rodney Newsom, completed a Third Party Function Report in March 2012. (Doc. 10-7 at 29) He noted that Plaintiff' had "constant radiating pains up both forearms and back," which disturbed her sleep. (*Id.* at 30) Mr. Newsom noted that he talked with Plaintiff, went to movies, and attended outdoor events. (*Id.* at 29) According to Mr. Newsom, Plaintiff enjoyed playing tennis and exercising, and did these things on a daily basis. (*Id.* at 33)

Mr. Newsom reported Plaintiff was able to take care of her personal hygiene, "prepare meals, and do household chores, and go shopping." (Doc. 10-7 at 29-30) However, in another section of the questionnaire, Mr. Newsom indicated that Plaintiff was unable to do any household chores. (*Id.* at 31) He believed Plaintiff had difficulty with zipping trousers, buttoning a blouse, and holding utensils. (*Id.* at 30) Mr. Newsom indicated that Plaintiff had problems with walking more than 25 yards bending, and handling. (*Id.* at 33-34) In addition, he indicated that Plaintiff's impairments affected her ability to

7

lift, squat, bend, stand, reach, walk, kneel, climb stairs, use her hands, follow instructions, and concentrate. (*Id.* at 34)  Mr. Newsom also noted that Plaintiff wore a neck pace, which he believed was prescribed in November or December 2011. (Doc. 10-7 at 36)

### 2. Jessica Wosik

Ms. Wosik reported that she is "a family friend of [Plaintiff's] as well as a distant member of her family." (Doc. 10-7 at 53)  Ms. Wosik stated she has known Plaintiff since 2008, and had watched Plaintiff's body "deteriorate." (*Id.*)  She stated that she observed Plaintiff's pain made "it hard for her to do ordinary everyday things," including walking up stairs and going grocery shopping. (*Id.*)  Ms. Wosik believed that "everyday easy activities [took] a toll on [Plaintiff] to complete" and her quality of life had decreased. (*Id.*)  She reported:

> Patricia has issue[s] even falling asleep comfortably and I have seen the lack of energy due to sleepless nights involving pain.  Patricia has had issue[s] with getting out of bed, which also prompts her mood to become depressed.  I have seen her crying due to pain and frustration that her body cannot move like it once did.  The toll it has taken on her mind, body, and soul is irreversible.  Her interdependence has been taken away by this pack pain; she is a completely different person now.  Simple activities such as bathing, bending, and even giving a hug have become difficult for her.

Ms. Wosick noted she went to the grocery store for Plaintiff or met her there "to assist her due to the pain." (*Id.*)  Further, Ms. Wosick stated she witnessed Plaintiff having "episodes of severe depression and moodiness." (*Id.*)

### 3. Shannon Williamson

Plaintiff's brother, Shannon Williamson, prepared a lay witness letter in December 2013. (Doc. 10-7 at 62)  Mr. Williams noted that when around Plaintiff, he "noticed she [was] constantly is (sic) extreme pain, which makes it hard for her to get around and to move without feeling this excruciating pain." (*Id.*)  According to Mr. Williams, Plaintiff "report[ed] feeling sad to being depressed because of the pain she endures… and [was] observed to display evidence of her depression by her sadness, moodiness, irritability," and remaining inside the house. (*Id.*)  Mr. Williamson stated that Plaintiff "sought the support of… family members due to her increased sadness and depression of not being able to functioning without feeling the ability of carrying out simple tasks." (*Id.*)  Further, he noted he "witnessed [Plaintiff] waking up while asleep screaming from the pain she experiences," including "pain in her legs, feet, and buttocks." (*Id.*)  Mr. Williamson believed Plaintiff was "willing

to try to do things, but her stamina to complete tasks are very difficult to complete due to her chronic pain and suffering." (*Id.*)

## C.     Administrative Hearing Testimony

Plaintiff testified at a hearing before the ALJ on January 21, 2014. (Doc. 10-3 at 34) She reported she had a high school education, and completed some vocational training on computers. (Doc. 10-3 at 37) Plaintiff stated that her past work including "working with disability women" at a group home, which involved taking them on outings, changing diapers, and lifting. (*Id.* at 40-41) She last worked for the IRS when she "tried to switch up" jobs. (*Id.* at 41)

Plaintiff reported she had constant back pain that was "almost unbearable." (Doc. 10-3 at 42-43) She said it hurt when she reached, bent, and stretched. (*Id.* at 42) In addition, Plaintiff testified that sitting too long exacerbated the pain. (*Id.* at 44) Plaintiff stated that she took medication for the pain, though she tried "not to take it too much," and used heating and icing pads. (*Id.* at 45-46)

She said she was able to do household chores, but "[n]ot like [she] used to." (Doc. 10-3 at 38) She stated it was "very frustrating" and she was still trying to wash dishes. (*Id.*) Plaintiff testified she "used to go walking a lot," but it felt like there were "weights on [her] back." (*Id.* at 39) Plaintiff said that "[o]n a bad day," she was exhausted and had to rest. (*Id.* at 40) She stated she needed assistance with showering, because she had recently dropped her soap and her "vision went black" when she bent over to pick it up. (*Id.* at 38) Plaintiff said since that time, her husband "kind of makes sure" she is "not so fast … to bend over." (*Id.*)

Plaintiff estimated that "[o]n a good day," she could lift and carry 10 pounds. (Doc. 10-3 at 47) She also believed she sit for "10/15" minutes, stand "around four or five minutes," and walk [l]ess than one block" at a time. (*Id.* at 48) Plaintiff stated she could not reach overhead or to the front without pain. (*Id.*) According to Plaintiff, she rested for "[f]our to five hours" each day, and longer on bad days. (*Id.* at 49) She reported she had only "two to three… good days" each week. (*Id.* at 50)

## D.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of December 1, 2010. (Doc. 10-3 at 17) At step two, the ALJ found Plaintiff's "lumbar degenerative disc disease" was a severe impairment. (*Id.* at 18) At step

three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing, including Listing 1.04. (*Id.*) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk 6 to 8 hours each in an 8-hour workday; and occasionally stoop, crouch, crawl, kneel, and climb. She must be able to sit or stand at will.

(*Id.*) Based upon this RFC, the ALJ concluded Plaintiff was "unable to perform any part relevant work." (*Id.* at 23) In addition, the ALJ determined Plaintiff was able to perform other "jobs that exist in significant numbers in the national economy." (*Id.* at 24) Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 24-25)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred at step three, in evaluating whether her impairment meets Listing 1.04. (Doc. 15 at 11-12) In addition, Plaintiff asserts the ALJ erred in analyzing the medical record and lay witness statements. (*Id.* at 13-17) On the other hand, the Commissioner argues that "the ALJ's decision was supported by substantial evidence and free from reversible legal error." (Doc. 16 at 10)

### A.    The ALJ's Step Three Findings

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original). "If the impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step." *Bowen v. Yuckert*, 482 U.S. 137, 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

The ALJ determined Plaintiff's degenerative disc disease does not meet Listing 1.04, which governs of musculoskeletal impairments and requires a claimant to show a disorder of the spine such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[], resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04. In addition,

there must be:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*

Plaintiff contends the ALJ erred in her analysis of Listing 1.04, because she "made contradictory findings as to whether certain requirements of the Listing were met." (Doc. 15 at 12) Plaintiff observes:

> On the one hand, the ALJ states that the plaintiff's degenerative disc disease does not meet Listing 1.04 criteria because there is no evidence of the compromise of a nerve root, nerve root compression or positive straight-leg raising test. (AR 17) Yet, on the other hand, the ALJ cites evidence of a May 2013 MRI scan of plaintiff's lumbar spine showing a disc bulge "likely compressing the S1 nerve root" and that "[plaintiff] tested positive for pain on straight-leg raising testing." (AR 18, 20)

(*Id.*, alteration in original) Plaintiff contends that this "contradiction – concerning the determinative issue of meeting a Listing – does not allow for meaningful view by the District Court." (*Id.*)

Significantly, however, at step three of the sequential evaluation, the claimant bears the burden of demonstrating her impairments equal a listed impairment. *Bowen*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). The Supreme Court explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (emphasis in original). Therefore, to meet his burden at step three, Plaintiff must demonstrate she meets the Listing requirements. In the alternative, Plaintiff may show her condition "equals" Listing 1.04 with "symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of [the] relevant listed impairment." *Tackett*, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526). Here, Plaintiff failed to carry that burden.

Listing 1.04A requires positive tests in both the supine and sitting positions. *See* 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04A. As noted by the ALJ, Plaintiff's "[s]traight leg raising testing was negative while seated, but positive for pain at 90 degrees while lying down." (Doc. 10-3 at 20; *see also* Doc. 10-8 at 23) In addition, Dr. Wagner determined that Plaintiff's senses were intact and her strength was "5/5" in each extremity. (Doc. 10-8 at 23) Plaintiff does not identify any evidence in the record demonstrating positive straight leg raising tests in both the supine and seated positions. Consequently, the ALJ did not err in finding that Plaintiff did not meet the requirements of the Listing 1.04A.

## B.     Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff contends the ALJ erred in evaluating the opinion of her treating physician, Dr. Khaira. (Doc. 15 at 13-15) Because the limitations Dr. Khaira assessed were contradicted by physicians who opined Plaintiff's physical impairments were not severe and she didn't have a medically determinable mental impairment, the ALJ was required to identify specific and legitimate reasons for rejecting Dr. Khaira's opinions.

In explaining the weight given to the medical opinions, the ALJ indicated "little weight" was given to the opinions of Dr. Khaira. In doing so, the ALJ found the opinions were unsupported by medical evidence, were inconsistent with the treatment notes, and the treatment sought and provided. (*See* Doc. 10-3 at 19-20) *See e.g., Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008); (an opinion may be rejected where inconsistent with the treatment records); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (an opinion lacking the support of clinical findings may be rejected).

1.   Lack of clinical findings

The opinion of a physician may be rejected when it is "conclusory and brief" and lacks the support of clinical findings. *Magallanes*, 881 F.2d at 751; *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (a physician's opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion"). Consequently, the Ninth Circuit determined that an ALJ may reject or give less weight to a treating physician's opinion that is in the form of a checklist, where the opinion is brief and lacks supportive objective evidence. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ permissibly rejected . . . check-off reports that did not contain any explanation of the bases of their conclusion"); *Batson v Comm'r of Soc. Security*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("treating physicians' views carried only minimal evidentiary weight" when in the form of a checklist and lacking supportive objective evidence).

For example, in *Burkhark v. Bowen*, the Ninth Circuit determined the ALJ did not err in rejecting the opinion of a treating physician where the doctor "provided nothing more than a statement of his unsupported opinion." *Id.*, 856 F.2d 1336, 1339 (9th Cir. 1988). The court found "[t]here was no description -- either objective or subjective -- of medical findings, personal observations or test reports upon which [the physician] could have arrived at his conclusion." *Id.* Without such information, the Court found there was "no error" by the ALJ rejecting the physician's opinions that

the claimant was disabled. *Id.*

Similarly, here, Dr. Khaira offered his opinions in a check-box form. As the ALJ observed, Dr. Khaira "left the part of the form blank that asked him to explain the reason for his conclusion why the claimant was incapable of low stress work," and did not offer any diagnoses, signs, symptoms, or objective findings to support his conclusion. (Doc. 10-3 at 19-20; *see also* Doc. 10-11 at 37) Rather, as the ALJ concluded, Dr. Khaira's "opinion that the claimant was incapable of even low stress work and that she was likely to be 'off task' for 25% or more of the workday lacked bases." (Doc. 10-3 at 19) Given Dr. Khaira's failure to identify any clinical findings or observations that supported his conclusions, the ALJ did not err in giving less weight to the opinion of Dr. Khaira.

2.      Inconsistences

The Ninth Circuit explained the opinion of an examining physician may be rejected where an ALJ finds incongruity between a doctor's assessment and his own medical records and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti*, 533 F.3d at 1041. Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, to reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

In this case, the ALJ found the "[t]he physical limitations he opined were not consistent with his own records." (Doc. 10-3 at 20) For example, the ALJ noted that treatment records showed Plaintiff "sat comfortably in his office with no pain." (*Id.*, citing Exh. 8 F, pp. 21-22 [Doc. 10-11 at 22-23]) The ALJ found the "limitations… we also inconsistent with the normal musculoskeletal hospital examination in April 2012 showing no joint pain, full motion, and a non-tender back." (Doc. 10-3 at 20) Further, the ALJ found the limitations "were not consistent with the limitations opined by Dr. Wagner," who found Plaintiff had "full motor strength, no sensory deficits, and intact reflexes" and "could sit, stand, and walk without limitation." (*Id.*) Finally, the ALJ noted, "Dr. Khaira's clinical

records reflected intermittent complaints of back pain, insufficient to support the extreme limitations opined." (*Id.*)

Because the ALJ identified inconsistencies in the record—including with Dr. Khaira's own treatment records—this is a specific and legitimate reason for giving less weight to the opinions. *See Thommasetti,* 553 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]").

### 3. Treatment provided

The Ninth Circuit has determined the opinion of a treating physician may be undermined where that physician "prescribe[s] a conservative course of treatment," yet opines a claimant is disabled. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Here, the ALJ observed there was "insufficient evidence of any psychiatric treatment" by Dr. Khaira, who opined Plaintiff had mental limitations and was precluded from low-stress work. (Doc. 10-3 at 20) Indeed, the treatment notes do not indicate that Plaintiff ever sought psychiatric treatment from Dr. Khaira, and Plaintiff told Dr. Cohn that she did not have psychiatric issues. (Doc. 10-9 at 27) Accordingly, the lack of treatment supports the decision to give less weight to the opinion of Dr. Khaira.

## C.  Lay Witness Testimony

Plaintiff contends the ALJ erred in rejecting the lay witness statements offered by family and friends. (Doc. 15 at 15-17) The ALJ must consider statements of "non-medical sources" including spouses, parents, and other persons in determining the severity of a claimant's symptoms. 20 C.F.R. §404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work."). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted). To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

///

### 1. Rodney Newsom

The ALJ rejected the report of Mr. Newsom, explaining his "statements do not establish that the claimant is disabled." (Doc. 10-3 at 21-22) In addition, the ALJ noted:

> There was no evidence showing he [is] medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms or the frequency or intensity of unusual mood or mannerisms, so the accuracy of his statements is questionable. As the spouse of the claimant, the issue of secondary gain cannot be ruled out – particularly given the claimant's testimony that her husband was disabled. Oddly, the claimant reported in her Work Background Report, she worked in 2013 caring for Mr. Newsom by giving him his medication, preparing his meals, and transporting him to his doctor appointments, so his report that she did little activity was not credible. (See Exhibit 9D).

(*Id.* at 22) Plaintiff contends these reasons were not legally sufficient to reject Mr. Newsom's statement. (*See* Doc. 15 at 15-17)

The Regulations specifically instruct all administrative law judges to consider testimony from "non-medical source" who have an opportunity to observe the claimant. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Thus, the fact that Mr. Newsom did not have medical training is not a proper reason to reject his testimony. *See Dodrill*, 12 F.3d at 919 (explaining the Regulations instruct the ALJ to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work") (emphasis added). In addition, an ALJ may not reject lay witness testimony solely because the witness may have "financial interest in seeing the claimant receive benefits." The Ninth Circuit explained that an ALJ may not rely on "characteristics common to all spouses," such as a financial interest, to discount a spouse's testimony. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). Nevertheless, a lay witness's close relationship to a claimant and possible pecuniary interest in a particular outcome, when coupled with inconsistencies with the record, have been found to be germane reasons. *See, e.g., Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

Significantly, here, the ALJ also found Mr. Newsom's report was inconsistent with the record. (Doc. 10-3 at 22) As the ALJ observed, Plaintiff reported she prepared Mr. Newsom's meals and transported him to doctor appointments, which was inconsistent with his assertion that "she did little activity." (*See id.*) This inconsistency is a germane reason supporting the decision to reject the limitations reported by Mr. Newsom. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (inconsistency with a claimant's self-reported activities of daily living is a specific and

germane reason to discount lay witness' testimony.)

### 2. Jessica Wosik

The ALJ gave "the statements and observations of Ms. Wosik little weight." (Doc. 10-3 at 22) The ALJ observed that Ms. Wosik "was not in a good position to observe the claimant's purported 'constant' pain or sleepless nights." (Doc. 10-3 at 22) Likewise, the ALJ noted Ms. Wosik's statement that Plaintiff "had difficulty bathing appear[ed] based on the claimant's statement's rather than personal observation." (*Id.*) As a result, the ALJ concluded the report "lacks bases." (*Id.*)

Notably, the Ninth Circuit determined that lay witnesses are only competent to testify as to a claimant's limitations and condition if "in a position to observe a claimant's symptoms and daily activities." *Dodrill*, 12 F.3d at 918-919. Because Ms. Wosik was not in such a position, the ALJ identified a germane reason for rejecting the limitations she identified.

### 3. Shannon Williamson

The ALJ noted that Plaintiff's brother, Mr. Williamson "stated he had observed Plaintiff in excruciating pain" and "having a hard time falling asleep," and that Plaintiff "was sad and depressed 'most' days." (Doc. 10-3 at 22) In addition, Mr. Williamson reported that Plaintiff "had pain to the extent she could not control her limbs or stand up straight." (*Id.*)

The ALJ found Mr. Williamson's "statements were not consistent with the evidence taken as a whole." (Doc. 10-3 at 22) This is a germane reason for rejecting the lay witness statement. *See Greger*, 464 F.3d at 972; *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). In addition, the ALJ noted that Mr. Williamson lived "approximately 175 miles" away from his sister, and "was not in a good position to comment on the claimant's daily activities or limitations." (Doc. 10-3 at 22) As discussed above, this also is a germane reason to not adopt the limitations offered by a lay witness.

### **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ did not err in her analysis of whether Plaintiff satisfied Listing 1.04. In addition, the ALJ set forth legally sufficient reasons for rejecting the limitations imposed by Dr. Khaira, as well as the lay witness statements. Because the ALJ applied the proper legal standards and the decision is supported by substantial evidence in the record, the conclusion that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**;
2. The Commissioner's motion for summary judgment is **GRANTED**; and
3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Patricia Ann Williamson.

IT IS SO ORDERED.

Dated:   **March 3, 2017**              /s/ Jennifer L. Thurston
                                              UNITED STATES MAGISTRATE JUDGE